**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

GARY D. FOX

                              Plaintiff,

              - v -                                      Civ. No. 6:02-CV-1160
                                                              (FJS/RFT)
JO ANNE B. BARNHART, Commissioner of
Social Security,

                              Defendant,

**APPEARANCES:**                              **OF COUNSEL:**

LEGAL SERVICES OF CENTRAL NEW YORK        CHRISTOPHER CADIN, ESQ.
Attorney for Plaintiff
472 South Salina Street
Suite 300
Syracuse, New York 13202

HON. GLENN T. SUDDABY                      WILLIAM H. PEASE, ESQ.
United States Attorney for the             Assistant United States Attorney
Northern District of New York
Attorney for the Defendant
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261

**RANDOLPH F. TREECE**
**UNITED STATES MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER

In this action, Plaintiff Gary Fox moves, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), for

review of a decision by the Commissioner of Social Security denying his application for

Supplemental Security Income (SSI).[1]  Based upon the following discussion, this Court

recommends that the Commissioner's decision denying Social Security benefits be **affirmed**.

---

[1] This case has proceeded in accordance with General Order 18 which sets forth the procedures to be followed when appealing a denial of Social Security benefits.  Both parties have filed briefs, though oral argument was not heard. Dkt. Nos. 13 & 14.  The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

# I. BACKGROUND

## A. Claimant's History

Gary Fox, age forty-six at the time of the Hearing, was born on July 5, 1954.  Dkt. No. 9, Admin. Transcript [hereinafter "Tr."] at 111.  He is married and has two sons.  *Id*. at 141.  Fox, a highschool graduate, was self-employed as the owner of "The Variety Store," described by him as a continuous rummage sale.  *Id*. at 122, 129, & 133.  As part of his work, Fox would drive to various rummage sales, garage sales, and auctions, pick up merchandise, and resell them.  *Id*. at 34 & 129. Such work entailed some heavy lifting such as furniture and appliances.  *Id*. at 50.  Fox operated the store from 1976 until July 2000, when the store ceased operation.  *Id*. at 34-35.

Fox, who is right-hand dominant, claims a disability due to severe right carpal tunnel syndrome, ruptured biceps in right arm, and left carpal tunnel syndrome.  *Id*. at 38 & 116. Additionally, Fox states he suffers from "a touch of diabetes" and high blood pressure.  *Id*. at 144. Fox testified that he has no limitations in walking, sitting, bending or standing, though he does need assistance bathing and dressing.  *Id*. at 38-39 & 53.  He helps with simple household chores but is sometimes unable to complete such tasks.  *Id*. at 39 & 141.  He occasionally watches television and/or reads a book.  *Id*. at 39.  Fox further testified that he can't lift anything at all with his right arm and could barely lift four or five pounds, though "very clumsily," with his left hand.  *Id*. at 38 & 53-54.

## B. Procedural History

On February 24, 2000, Fox protectively filed for SSI benefits alleging a disability onset date of May 18, 1998.  Tr. at 110-13 & 116.  That application was denied initially and on reconsideration.  *Id*. at 76-79.  On November 7, 2000, a Hearing was held before Administrative

Law Judge (ALJ) Joseph Medicis, Jr., (Tr. at 30-44), which was continued on January 2, 2001 (Tr. at 45-75).  On April 4, 2001, ALJ Medicis issued an unfavorable decision against Fox.  *Id.* at 21-27. On August 14, 2002, the Appeals Council concluded there was no basis under the Regulations to grant Plaintiff's request for review, thus rendering the ALJ's decision the final determination of the Commissioner.  *Id.* at 5-6.  Exhausting all his options for review through the Social Security Administration's tribunals, Plaintiff now brings this appeal.

### C.  Medical History

In 1998, while playing basketball with his sons, Fox ruptured his right biceps tendon; the rupture was not repaired at the time and became irreversible.  Tr. at 173, 175, 178, & 181.  Also in 1998, Fox began receiving treatment from the Family Practice of Cortland for carpal tunnel syndrome.  In August 1999, after undergoing Nerve Conduction Studies and Electromyography (EMG/NCS), bilateral carpal tunnel syndrome was diagnosed, with moderately severe compression on the right and mild compression on the left.  *Id.* at 164 & 168-70.  Fox was referred to Dr. James Gaffney, a neurologist, and was told to avoid repetitive use of his hands and arms, especially on the right side.  *Id.* at 164.  Then, on October 21, 1999, Dr. Gaffney referred Fox to Dr. Jose R. Lopez, an orthopedic surgeon, for right carpal tunnel release surgery and right biceps tendon tear evaluation.  *Id.* at 172.  The prospect of a left carpal tunnel release was discussed, but Dr. Gaffney opined that Fox should first start with the right.  *Id.* at 174.  Prior to scheduling surgery, Dr. Lopez explained to Fox that some of the symptoms in his right arm, elbow, shoulder, and wrist would not be relieved by the surgery as they are unrelated to his carpal tunnel condition.  *Id.* at 179-80.  The surgery would, however, improve the symptoms in his thumb, index finger, long finger, and ring finger.  *Id.* at 179.

On January 7, 2000, Dr. Lopez performed the right carpal tunnel release surgery.  *Id*. at 208-16.  At a follow-up visit, almost two weeks post-surgery, Dr. Lopez reported that although Fox still had some numbness in the tip of his fingers, he had "excellent" range of motion.  *Id*. at 181.  On February 24, 2000, Dr. Gaffney noted that the surgery resolved the tingling in Fox's hands but he still experienced numbness on his fingertips.  *Id*. at 175.  Fox reported that he has pain in his right biceps and right forearm when he does any type of lifting or repetitive use of his hand.  *Id*.  Upon examination, Dr. Gaffney observed a deformity of the right biceps, as before.  *Id*.  There was pain in Fox's wrist extensors and flexors consistent with tendinitis, but no weakness.  *Id*.  Fox had "mild weakness of the right abductor pollicus brevis and a decreased sharp/dull in a median distribution."  *Id*.  Dr. Gaffney opined that due to the severe nerve injury prior to surgery, the release was only partially effective and there was little that could be done about the biceps tear.  *Id*.  Fox was advised to permanently limit use of his right arm and was given samples of Ultram, which failed to alleviate Fox's problems.  *Id*. at 37 & 175.  Dr. Gaffney stated there was little else he could do for Fox.  *Id*. at 175.

In a follow-up visit with Dr. Gaffney, on October 25, 2000, it was noted that Plaintiff continued to have weakness, pain, and sensory loss in his right hand due to severe carpal tunnel syndrome, "which did not fully respond to surgical release[]" and Fox has milder carpal tunnel syndrome on his left side.  *Id*. at 203.  It was similarly noted that Plaintiff has pain and weakness from a right biceps muscle tear, "which is chronic and not reversible at this point and time."  *Id*.  Upon examination, Dr. Gaffney observed that neurologically, there was thenar[2] atrophy and

---

[2] The term "thenar" refers to the "mound on the palm at the base of the thumb."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1696 (28th ed. 1994).  "The thenar muscles cover the thumb metacarpal and include the opponens pollicis, the abductor pollicis brevis, and the superficial head of the flexor pollicis brevis.  (These muscles are sometimes referred to as the 'OAF' muscles—for opponens, abductor, and flexor.)  The median nerve innervates these muscles."

weakness on the right, while mild abductor pollicus brevis weakness was noted on the left without

atrophy.  *Id*. at 214.  Bilaterally, there was diminished sharp/dull discrimination in the median

nerve.  *Id*.  Dr. Gaffney opined that Fox has a "severe, permanent injury" to his right upper

extremity and is limited in his ability to work; furthermore, Dr. Gaffney opined that Fox could not

do any lifting, pushing, pulling, or repetitive or fine movements with his dominate right arm.  *Id*. at

203.  Dr. Gaffney advised Fox that his left carpal tunnel condition was worsening and that he

should repeat nerve conduction studies; Fox, however, was adverse to doing so at that juncture.  *Id*.

at 214.  Dr. Gaffney warned Fox not to let his condition deteriorate too much or else it won't be

fixable, as with the right.  *Id*.

     Thereafter, on November 9, 2000, in response to inquiries from the ALJ, Dr. Gaffney

submitted a Medical Assessment Form detailing Fox's functional limitations.  *Id*. at 218-21.  Dr.

Gaffney determined that, depending on which hand, Fox was limited in lifting and carrying, though

the specific limitations were not provided.  *Id*. at 218.  Fox was unlimited in his ability to sit, stand,

or walk.  *Id*. at 219.  Fox's use of his hands were limited in that he could never use simple grasping

or fine manipulation with his right hand, while with his left, he could occasionally do such tasks.

*Id*.  Dr. Gaffney further opined that Fox was unlimited in his ability to climb, balance, stoop,

crouch, kneel, crawl, hear, and speak, however, Fox was limited, though the level was not specified,

in his ability to reach, handle, feel, push, and pull.  *Id*. at 220.  Finally, no environmental limitations

were noted.  *Id*. at 221.  By letter, dated December 13, 2000, Dr. Gaffney supplemented and, to

some extent, modified the above assessment after examining Fox and performing nerve conduction

studies of the left upper extremity.  *Id*. at 222.  Dr. Gaffney opined that Fox had mild left carpal

---

Joseph Lang, M.D., & Francis Counselman, M.D., *Common Orthopedic Hand and Wrist Injuries*, <u>Emergency Medicine</u>, *available at* <u>http://www.emedmag.com/html/pre/cov/covers/091503.asp</u> (last visited June 1, 2006).

tunnel syndrome, unchanged from the prior nerve conduction studies performed in August 1999. *Id*.  Such provided a "mild degree of disability in the left hand" but is a curable condition were Fox to undergo a release procedure.  *Id*.  Dr. Gaffney predicted a 90-95% chance of resolution of symptoms after surgical release.  *Id*.  As for the right hand, Dr. Gaffney noted a permanent severe disability.  For purposes of determining work related abilities, Dr. Gaffney again opined that Fox could sit, stand, and walk without limitation.  *Id*.  Fox could not lift more than ten pounds with his right hand, has difficulty with simple grasping and manipulation, and cannot perform repetitive movements with his right hand.  *Id*.

In the interim, on May 12, 2000, Fox was consultively examined by Kalyani Ganesh, M.D., an internist.  *Id*. at 184-87.  Fox's blood pressure was recorded at 164mmHg/92mmHg.  *Id*. at 185. Dr. Ganesh observed that Fox's gait was normal, he was able to walk on his heels and toes, and he needed no assistance getting on or off the examining table nor changing for the examination.  *Id*. Upon examining Fox's upper extremities, Dr. Ganesh noted that the range of motion in his right shoulder was limited due to pain as follows: forward elevation was 140°, abduction was 130° to 140°, adduction was 15° and painful, and internal and external rotations were full.  *Id*. at 186.  The left shoulder was normal.  *Id*.  Biceps and triceps strength on the right side was 3-4/5 and 5/5 on the left.  *Id*.  Dr. Ganesh further noted the absence of muscle atrophy, though there was a "hollow area in the [right] biceps and distal to it is a deformity, likely a biceps tear."  *Id*.  Further, she noted sensory abnormality as Fox claimed there was diminished sensation or paresthesia of his right hand. *Id*.  With regard to fine motor activity, Dr. Ganesh stated Fox could hold a large object, pick up and manipulate a coin, write with a pen, button a button, open a cap, and zip a zipper.  *Id*.  Intrinsics,

grasp, handshake, grip, and pinch grip were 5/5 bilaterally.  Tinel's sign[3] was negative bilaterally.  *Id*.  Dr. Ganesh opined that Fox's right biceps tear and residual effects post-right carpal tunnel release surgery were stable.  *Id*.  Based on the physical examination, Dr. Ganesh further opined that Fox did not appear to have gross physical limitations to sitting, standing, walking, climbing, or bending and that he appeared to have a moderate degree of limitation to lifting, carrying, pushing, pulling, and reaching, and a mild-to-moderate limitation to repetitive hand work.  *Id*.

On June 6, 2000, Sury Putcha, M.D., State Agency Consultant, reviewed Fox's medical record and opined, without examining Fox, that claimant had the following exertional limitations:  Fox could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand, sit, and/or walk six hours in an eight-hour workday, and was limited in his upper extremities in his ability to push and/or pull.  *Id*. at 189.  Dr. Putcha listed Dr. Ganesh's physical examination as evidence of the above findings.  *Id*.  Dr. Putcha further stated that Fox had no postural limitations, such as climbing, balancing, stooping, kneeling, crouching, or crawling, nor did he exhibit any visual, communicative, or environmental limitations.  *Id*. at 190-92.  With regard to manipulative limitations, Dr. Putcha found that Fox was limited in his abilities to feel and reach in all directions and feeling.  *Id*. at 190.  Such finding was based on Fox's statement to Dr. Ganesh that he had diminished sensation or paresthesia in his right hand as well as Dr. Ganesh's assessment of Fox's limited range of motion of his shoulders.  *Id*. at 191.  On July 11, 2000, Dr. Putcha's assessment was affirmed by B.W. Gajwani, M.D., a non-examining Agency review physician.[4]  *Id*.

---

[3] Tinel's sign is a "tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve.  Called also formication sign and distal tingling on percussion."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1527 (28th ed. 1994).

[4] The only difference between Dr. Putcha's and Dr. Gajwani's assessments is Dr. Gajwani found that Fox was unlimited in his ability to push and/or pull.  *Compare* Tr. at 189 *with* Tr. at 197.

at 196-202.

## II. DISCUSSION

### A. Standard of Review

Under 42 U.S.C. §§ 405(g) and 1383(c)(3),[5] the proper standard of review for this Court is not to employ a *de novo* review, but rather to discern whether substantial evidence supports the Commissioner's findings and that the correct legal standards have been applied.  *See Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *Urtz v. Callahan*, 965 F. Supp. 324, 325-26 (N.D.N.Y. 1997) (citing, *inter alia*, *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Succinctly defined, substantial evidence is "more than a mere scintilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record. *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); 42 U.S.C. § 405(g).  Where the weight of the evidence, however, does not meet the requirement for substantial evidence or a reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's decision may not be affirmed.  *Johnson v. Bowen*, 817 F.2d at 986.

### B. Determination of Disability

The standards for determining disability under Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance (SSDI)), and Title XVI, 42 U.S.C. § 1382c(a)(3) (Supplemental Security

---

[5] Section 1383(c)(3) makes section 405(g) applicable to the SSI program and provides the basis for this Court's jurisdiction and limitations of its review.

Income (SSI)), are identical, so that "decisions under these sections are cited interchangeably."

*Donato v. Sec'y of Health and Human Servs.*, 721 F.2d 414, 418 n.3 (2d Cir. 1983).  To be

considered disabled within the meaning of the Social Security Act, a plaintiff must establish an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §

1382c(a)(3)(A).  A disabling impairment is defined as "an impairment that results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques."  *Id*. at § 1382c(a)(3)(D).  Furthermore, the claimant's

physical or mental impairments must be of such severity

> that he is not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.

*Id*. at § 1382c(a)(3)(B).

In this regard, "work which exists in the national economy" means "work which exists in

significant numbers either in the region where such individual lives or in several regions of the

country."  *Id*.

In determining whether a claimant is disabled, the Commissioner follows a five-step

analysis set forth in the Social Security Administration Regulations.  20 C.F.R. § 416.920.  At Step

One, the Commissioner "considers whether the claimant is currently engaged in gainful activity."

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); 20 C.F.R. § 416.920(a)(4)(I).  If the claimant

is engaged in substantial gainful activity, he or she is not disabled and the inquiry ends.  If the

claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and

assesses whether the claimant suffers from a severe impairment that significantly limits his or her physical or mental ability to do basic work activities.  20 C.F.R. § 416.920(a)(4)(ii).  If the claimant suffers from a severe impairment, the Commissioner considers at Step Three whether such impairment(s) meets or equals an impairment listed in Appendix 1, in Part 404, Subpart P of the Regulations.  *Id.* at § 416.920(a)(4)(iii).  The Commissioner makes this assessment without considering vocational factors such as age, education, and work experience.  *Berry v. Schweiker*, 675 F.2d at 467.  Where the claimant has such an impairment the inquiry ceases as he or she is presumed to be disabled and unable to perform substantial gainful activity.  *Id.*  If the claimant's impairment(s) does not meet or equal the listed impairments, the Commissioner proceeds to Step Four and considers whether the claimant has the residual functional capacity (RFC)[6] to perform his or her past relevant work despite the existence of severe impairments.  20 C.F.R. § 416.920(a)(4)(iv).  If the claimant cannot perform his or her past work, then at Step Five, the Commissioner considers whether the claimant can perform any other work available in the national economy.  *Berry v. Schweiker*, 675 F.2d at 467; 20 C.F.R. § 416.920(a)(4)(v).

Initially, the burden of proof lies with the claimant to show that his or her impairment(s) prevents a return to previous employment (Steps One through Four).  *Berry v. Schweiker*, 675 F.2d at 467.  If the claimant meets that burden, the burden then shifts to the Commissioner at Step Five to establish, with specific reference to medical evidence, that the claimant's physical and/or mental impairment(s) are not of such severity as to prevent him or her from performing work that is available within the national economy.  *Id.*; *see also White v. Sec'y of Health and Human Servs.*,

_____

[6] "Residual functional capacity" is defined by the Regulations as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting.  Your residual functional capacity is what you can still do despite your limitations."  20 C.F.R. § 416.945(a).

910 F.2d 64, 65 (2d Cir. 1990).  In making this showing at Step Five, the claimant's RFC must be considered along with other vocational factors such as age, education, past work experience, and transferability of skills.  20 C.F.R. § 416.920(a)(4)(v); *see also New York v. Sullivan*, 906 F.2d 910, 913 (2d Cir. 1990).

### C. ALJ Medici's Findings

In addition to Fox's testimony at the Hearing, the ALJ secured the testimony of David Festa, a vocational expert (VE). Tr. at 30-75.  In addition to such testimony, the ALJ had Fox's medical records consisting of treatment reports and opinions from various treating and/or examining physicians, including, 1) Family Practice of Cortland, Robert Castellanos, M.D., and Robert Murray, P.A.; 2) Cortland Memorial Hospital; 3) James Gaffney, M.D., Neurologist Treating Physician; 4) Jose R. Lopez, M.D., Surgeon; 5) Kalayani Ganesh, M.D., Internist Consultive Examiner; 6) Sury Putcha, M.D., Non-Examining Agency Residual Functional Capacity Assessment; and 7) B.W. Gajwani, M.D., Non-Examining Agency Residual Functional Capacity Assessment.  *Id*. at 162-222.

Using the five-step disability evaluation, ALJ Medicis found that 1) Fox had not engaged in any substantial work activity, as defined in 20 C.F.R. § 416.972, since the onset disability date; 2) the loss of his right arm constitutes a severe impairment, in accordance with 20 C.F.R. § 416.921; 3) this medically determinable impairment did not meet or medically equal any of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4; 4) Fox has a residual functional capacity to perform at least sedentary and light work duties where it is not necessary to use both arms, and given such capacity, Fox is unable to perform any of his past relevant work; and 5) using the Medical-Vocational Rules as a framework, and in light of the VE's testimony, Fox's

RFC, age, educational background, and work experience, there are significant number of jobs in the national economy that Fox can perform.  Tr. at 21-27.  After reviewing the administrative transcript, the Court finds that the ALJ applied the correct legal standards and his findings are supported by substantial evidence of record.

### D.  Fox's Contentions

Plaintiff asserts several bases in support of his request that the Commissioner's decision be reversed.  First, Fox claims the ALJ erred in failing to fully develop his medical history of impairments other than his arm impairments.  Second, Fox states that the ALJ erred in assessing his RFC in that no substantial evidence supports the ALJ's finding that Fox could perform the full range of light or sedentary work.  Further, Fox claims that in assessing his RFC, the ALJ erred in not crediting Fox's allegations of the nature and intensity of his symptoms and in failing to properly defer to his treating physician, Dr. Gaffney, in accordance with the Treating Physician Rule.  Finally, Fox contends that the number of available jobs identified by the VE do not adequately represent the limited job that Plaintiff can perform.

### 1.  ALJ's Duty to Develop the Record

Fox contends the ALJ failed to adequately develop the record with regard to other impairments, namely diabetes and a mental impairment.  An ALJ has an affirmative duty to develop the administrative record.  *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).  This duty applies even where, as here, the claimant is represented by counsel.  *See Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  This duty requires the ALJ to make "every reasonable effort to help [the claimant] get medical reports from [his or her] own medical sources."  *Id*. (quoting 20 C.F.R. § 404.1512(d)); *see also* 20 C.F.R. § 416.912(d).  Further, the ALJ is statutorily authorized to issue subpoenas for both

medical records and testimony of witnesses.  42 U.S.C. § 405(d).  Courts within this circuit have held "that an ALJ has an <u>independent</u> duty to make reasonable efforts to obtain a report prepared by a claimant's treating physician."  *Devora v. Barnhart*, 205 F. Supp. 2d 164, 174 (S.D.N.Y. 2002) (collecting cases) (emphasis added).  Only if such efforts fail, can the ALJ then close the record and issue a decision.  *See id.* at 175.

At the Hearing, the ALJ asked Fox whether he had any other impairments other than the limitations in his right arm, to which Fox replied that he had no other medical problems.  Tr. at 36.  He then corrected himself and stated he had diabetes but that it was controlled by diet and had not received any medication.  *Id*.  In October 1999, it was noted that Plaintiff had an elevated glucose of 244, which Dr. Castellanos, his treating physician at the time, noted was indicative of "borderline diabetes."  *Id*. at 165.  The record also reflects a glucose of 133 on January 3, 2000, with 76-115 mg/dL being normal.  *Id*. at 182 & 210.  A reading of 133 falls within the range of impaired glucose tolerance (range of 115-139) not diabetes (range of 140 and above).  *The Merck Manual* 170, Table 13-2 (17th ed. 1999).  Neither Dr. Gaffney nor Dr. Ganesh, who conducted reviews of all of Plaintiff's systems, reported any limitations with regard to diabetes.  Tr. at 185, 214, & 220-21.  Given the fact that no doctors have reported any limitations nor treated Fox for diabetes, and given Plaintiff's own admission that his condition was controlled with diet, there is no basis for Plaintiff's contention that the ALJ needed to develop the medical evidence on diabetes.

Next, Plaintiff contends that the ALJ should have developed the record for a mental impairment.  To support this contention, Plaintiff cites to a letter his wife wrote after the first Hearing and a notation in the record in October 1999 that Plaintiff went back to smoking cigarettes because of stress.  *Id*. at 105-06 & 165.  Notably, Fox did not allege a mental impairment during the

entire appeals process, either at the time he applied, requested reconsideration, and/or requested a hearing. *Id*. at 116, 144, & 152. Neither he nor his representative mentioned a mental impairment at the Hearing. Furthermore, there is no report of depression or other mental impairment in any of the medical records. The record does reflect that Plaintiff was a chronic smoker with a one-and-a-half to two-or-more-packs per day habit. *Id*. at 40 & 185. As the Commissioner aptly states, "[a] return to smoking by a chronic smoker does not evidence a mental impairment." Dkt. No. 14 at p. 12. Thus, we agree that Plaintiff has not substantiated his contention that the ALJ should have developed the record further with regard to any mental impairments.

### 2. Residual Functional Capacity

Fox next contends that the ALJ erred in assessing his RFC, and further, the ALJ erred in failing to give full deference to Dr. Gaffney's opinions and full credibility to Fox's allegations regarding the nature and intensity of his symptoms.

Under Step Four of the disability analysis, the Commissioner assesses a claimant's RFC as a basis for determining the particular types of work the claimant may be able to perform despite the existence of physical and/or mental impairments. *See* 20 C.F.R. § 416.945; 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(c). In qualifying work in the national economy, the Regulations classify and define jobs as sedentary, light, medium, heavy, and very heavy. 20 C.F.R. § 416.967. If the applicant can still perform the kind of work he or she performed in the past, they are deemed not disabled. *Id*. at § 416.945(a)(5). In determining RFC, the ALJ can consider a variety of factors including a treating physician's or examining physician's observations of limitations, the plaintiff's subjective allegations of pain, physical and mental abilities, as well as the limiting effects of all impairments even those not deemed severe. *Id*. at §§ 416.927 & 416.929.

In assessing Fox's RFC, the ALJ concluded that Fox had lost the use of his right arm but was nevertheless capable of performing "approximately sedentary and light work duties where it is not necessary to have the use of both arms."  Tr. at 24 & 27.[7]  In making the above assessment, the ALJ stated the weight afforded to the various opinions in the record as follows:

> The opinions of the State Agency experts are granted the substantial evidentiary weight due to them pursuant to Social Security Ruling 96-6p. . . . The opinions of the treating physician are granted the additional weight due to them pursuant to 20 CFR Section 1527(d), particularly insofar as they are also in line with the entirety of the medical record in this case. (See Social Security Ruling 96-2p.)  These opinions act to some extent to decrease the total RFC earlier assessed by the State Agency experts.

Tr. at 24.

Plaintiff's subjective allegations regarding pain and other symptoms and their effect on his ability to engage in work activity were not credited.  Specifically, the ALJ stated,

> [g]iven the claimant's activities, minimal clinical findings and the nature of medical treatment, and the limited nature of limitations and restrictions credibly imposed by the treating sources, assessment of the consultant examiners for the Administration and the Administration's expert medical record examiners, the claimant's allegations of totally disabling symptoms are not credible.

*Id*.

Then, based upon the VE's testimony and using the Medical-Vocational Guidelines as a framework,

---

[7] The Social Security Regulations define light work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b).

While sedentary work is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).

the ALJ found that Plaintiff could perform the job of a surveillance system monitor, which requires essentially sedentary work.

Under the Regulations, a treating physician's opinion as to the nature and severity of a claimant's impairment is entitled to "controlling weight" when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2); *see also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999).[8]  However, "[a] treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *see also* 20 C.F.R. § 416.927(e) (Commissioner provides the ultimate decision on disability).  The treating physician doctrine recognizes that a claimant's treating sources, which in most cases are medical professionals, are more apt to "provide a detailed, longitudinal picture of [the patient's] medical impairment(s) and may bring a unique perspective to the medical findings" as opposed to an evaluation of a one-time non-examining, non-treating physician.  20 C.F.R. § 416.927(d)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993).

In analyzing a treating physician's opinion, "the ALJ cannot arbitrarily substitute his [or her] own judgment for competent medical opinion." *McBrayer v. Sec'y of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983); *see also Balsamo v. Chater*, 142 F.3d 75, 80-81 (2d Cir. 1998).  Furthermore, when weighing all medical opinions and assessing what weight to accord, "[t]he duration of a patient-physician relationship, the reasoning accompanying the opinion, the opinion's consistency with other evidence, and the physician's specialization or lack thereof" are

---

[8] A "treating physician" is the claimant's "own physician, osteopath or psychologist (including outpatient clinic and health maintenance organization) who has provided the individual with medical treatment or evaluation, and who has or had an ongoing treatment and physician-patient relationship with the individual." *Jones v. Apfel*, 66 F. Supp. 2d 518, 524-25 (S.D.N.Y. 1999) (quoting *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988)).

considerations. *Schisler v. Sullivan*, 3 F.3d at 568; 20 C.F.R. § 416.927(d)(1)-(6); *see also Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998).  In the event the ALJ does not give controlling weight to the treating physician, he must specifically state the reasons for doing so.  20 C.F.R. § 416.927(d)(2).

        We first note that the ALJ's finding that Fox retains the ability to perform light work can only be supported by Drs. Putcha's and Gajwani's RFC assessments.  Neither of these doctors examined Plaintiff, they merely reviewed the entire medical record.  More importantly, at the time of their record reviews, June 7 and July 11, 2000, respectively, Dr. Gaffney, Fox's treating physician, had not yet submitted any opinion as to the limiting effects of Fox's impairments; such opinion was sought and received after the adjournment of the first Hearing.  It seems that much of Drs. Putcha's and Gajwani's findings were supported by the orthopedic examination conducted by Dr. Ganesh.  However, Dr. Ganesh never made explicit findings as to Fox's limitations, at least insofar as Plaintiff's ability to lift and/or carry a specific weight.  Nevertheless, Drs. Putcha and Gajwani opined that Plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds.[9]  Later, Dr. Gaffney opined that Fox, depending on which hand, was limited in his abilities to lift, carry, reach, handle, feel, push, and/or pull; he later opined that Fox could not lift more than ten pounds with his right hand, though he did not specify whether his left hand was similarly limited.  Tr. at 218, 220, & 222.

        In his opinion, the ALJ noted that Dr. Gaffney's opinion decreases the Agency experts'

---

        [9] As stated above, the only discrepancy between the two RFC Assessments is that Dr. Putcha found Fox's ability to push and/or pull was limited in his upper extremities, while Dr. Gajwani found that Fox was unlimited in such task.  *See supra* note 3.

*-17-*

prior RFC assessment, and afforded Dr. Gaffney's opinions "additional weight."[10]  He then found

Fox capable of performing light and sedentary work duties where it is not necessary to have the use

of both arms.  While the Plaintiff quibbles with such words as controlling weight versus additional

weight, the ALJ's findings and statements demonstrate that he correctly applied the Treating

Physician Rule and accorded proper weight to Dr. Gaffney's opinions.  Had the ALJ rejected Dr.

Gaffney's opinions, in addition to stating so and explaining reasons therewith, he would not have

limited Fox's ability to perform light work functions as only in instances where it is unnecessary to

have use of both arms.  To reiterate, as defined by the Regulations,

> [l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be
> very little, a job is in this category when it requires a good deal of walking or standing,
> or when it involves sitting most of the time with some pushing and pulling of arm or leg
> controls.

20 C.F.R. § 416.967(b).

Even by Dr. Gaffney's own account, Fox can lift up to ten pounds with his right hand.  As his left

hand is only mildly impaired, and curable, it follows that Fox could lift more than ten pounds with

such hand.  Tr. at 222.  The ALJ did not find Fox capable of performing the <u>full range</u> of light work,

but rather, only light work activities that do not require the use of both hands.  Furthermore, despite

Plaintiff's conflicting testimony,[11] the medical record supports the finding that Plaintiff had no

limitations in sitting, standing, or walking.  *See* Tr. at 219-220 & 222 (Dr. Gaffney reports that Fox

can stoop (bend forward at the waist), sit, stand, and walk without limitations); 186 (Dr. Ganesh

---

[10] State Agency Review Physicians are explicitly referred to in the Regulations as experts: "State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation."  20 C.F.R. § 416.927(f)(2)(i).

[11] At the November 2000 Hearing, Plaintiff testified that he had no limitations in sitting, standing, and walking (Tr. at 33), yet, at the January 2001 Hearing, Plaintiff testified that he had occasional difficulties bending due to a bad back, an occasional sore back from sitting too long, and his diabetes limited his ability to walk and stand (Tr. at 53).

observed that Fox appeared to have no limitation in sitting, standing, walking, or bending).  Since

Dr. Gaffney failed to assert an opinion as to Fox's lifting/carrying capability with his left hand,

despite being specifically asked to do so, it was entirely proper for the ALJ to look to other medical

evidence in the file, including the opinions of the State Agency Examiners.  By doing so, the ALJ

did not discount or afford less weight to the treating physician's opinion.  Accordingly, we find that

the ALJ applied the correct legal standards and substantial evidence supports his limited finding

with regard to Fox's capability to engage in some light work activity.  Alternatively, even if this

Court were to find otherwise, a reversal on this issue would be moot as the ALJ also found that Fox

was capable of performing limited sedentary work and, more specifically, found that Fox could

perform the exertional demands of a surveillance system monitor, which requires principally

sedentary work.  As explained below, we similarly find the correct legal principles were applied and

substantial evidence supports the ALJ's finding that Fox could perform sedentary work.

By its very definition, the concept of light work includes the capability to perform sedentary

work.  20 C.F.R. § 416.967(b) ("If someone can do light work, we determine that he or she can also

do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or

inability to sit for long periods of time.").  No one, including the ALJ, disputes that Fox has lost use

of his dominant right arm.  Tr. at 26.  However, the "loss, or the loss of the use, of an arm or hand is

not disabling per se."  *Odle v. Sec'y of Health and Human Servs.*, 788 F.2d 1158, 1161 (6th Cir.

1985) (cited in *Wright v. Chater*, 969 F. Supp. 143, 147 (W.D.N.Y. 1997)); *see also Pratt v. Bowen*,

1998 WL 108431 (S.D.N.Y. Oct. 3, 1988) (upholding the Commissioner's decision denying

benefits to a claimant who lost the use of his dominant right arm).  With regard to his left hand,

Plaintiff contends that he is limited to lifting four or five pounds and complains that the ALJ

improperly rejected this and other allegations regarding the nature and intensity of his symptoms.

Under 20 C.F.R. § 416.929(a), a claimant's description of symptoms and subjective pain will be considered in determining a claim for disability to the extent in which "symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  A claimant's statements about the persistence, intensity, and limiting effects of these symptoms are evaluated in the context of all objective medical evidence, which includes medical signs and laboratory findings.  *Id*. at § 416.929(c).  Once medically objective evidence is submitted, the ALJ must identify the severity of the pain and whether that pain will limit the claimant's ability to work. *Id*.  "It is well settled that 'a claimant's subjective evidence of pain is entitled to great weight' where . . . **it is supported by objective medical evidence**."  *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (emphasis added) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983)).  However, in a case where subjective symptoms are identified, "the ALJ has discretion to evaluate the credibility of the claimant and to arrive at an independent judgment, in light of the medical findings and other evidence, regarding the true extent of the pain alleged." *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y 1987).  Where the ALJ resolves to reject subjective testimony with regards to pain and other symptoms, he or she "must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his [or her] determination is supported by substantial evidence." *Id*. at 608 (citing, *inter alia*, *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1045 (2d Cir. 1985)).  In evaluating a claimant's complaints of pain, an ALJ must consider several factors set forth in the Regulations including:

(I)     [The claimant's] daily activities;
(ii)    The location, duration, frequency, and intensity of [claimant's] pain or other

*-20-*

symptoms;

(iii)     Precipitating and aggravating factors;

(iv)     The type, dosage, effectiveness, and side effects of any medication [claimant] take[s] or ha[s] taken to alleviate [his or her] pain or other symptoms;

(v)      Treatment, other than medication, [claimant] receive[s] or ha[s] received for relief of [his or her] pain or other symptoms;

(vi)     Any measures [claimant] use[s] or ha[s] used to relieve [his or her] pain or other symptoms (e.g., lying flat on [his or her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii)    Other factors concerning [claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3).

The medical record does not support Plaintiff's allegations regarding his limitations, especially with regard to his left hand.  "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." S.S.R. 96-7p, 1996 WL 374186, at *5, *Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Clams: Assessing the Credibility of an Individual's Statements* (S.S.A. 1996).  Dr. Gaffney found that Plaintiff was able to occasionally engage in simple grasping and fine manipulation with his left hand.  Tr. at 219.  Dr. Ganesh also found that Plaintiff could lift a large object, button a button, zip a zipper, and handle and manipulate coins, and that Plaintiff had full grip strength in his left hand.  *Id*. at 186.  Plaintiff testified that he "needed assistance with bathing and dressing," however, he told Dr. Ganesh that he could "bath, shower, and dress himself" and Dr. Ganesh observed he needed no assistance getting on and off the examining table and changing for the examination.  *Id*. at 39 & 185.  Similarly, Plaintiff's testimony that he could at most lift four or five pounds with his left hand is belied by Dr. Gaffney's assessment that Plaintiff could lift up to ten pounds with his right hand, which is more severely impaired than his left hand.  *Id*. at 54 & 222.

Further evidence in the record supports the ALJ's decision to not fully credit Plaintiff's allegations.  At the first Hearing, Fox testified that he had no limitations in his ability to sit, stand,

or walk, however, at the second Hearing he testified that his ability to sit, stand, and/or walk was limited by his diabetes.  Tr. at 36, 38-39, & 53-54.  In addition to the inherent conflicting testimony, the medical record shows, as discussed above, that Fox does not suffer from diabetes, but rather impaired glucose tolerance, which he himself admits is controlled by diet and not medication. Furthermore, none of the doctors, treating, examining, or non-examining, found that Fox was limited in his ability to sit, stand, or walk.

Given Plaintiff's inconsistences in describing his limitations coupled with the extent objective medical evidence exists which would support the existence of such symptoms, as well as the opinions of various physicians, including Plaintiff's own treating physician, we find that substantial evidence of record supports the ALJ's finding that Plaintiff's allegations of totally disabling symptoms was not fully credible.

### 3.  Vocational Expert Testimony

At Step Five of the sequential disability evaluation, the Commissioner bears the burden of proving that despite the claimant's severe impairments he or she is capable of performing work that is available in the national economy.  20 C.F.R. § 416.920(g).  In determining whether jobs exist in the national economy, administrative notice of "reliable job information available from various governmental and other publications" may be taken, including The Dictionary of Occupational Titles, published by the Department of Labor.  *Id*. at § 416.966(d).  If a claimant is unable to perform a full range of a particular exertional category of work, or an issue exists as to whether the claimant possesses transferable work skills, the ALJ may utilize the services of a VE.  *Id*. at § 416.966(e).  "A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given

his or her functional limitations." *Charlebois v. Comm'r, Soc. Sec. Admin.*, 2003 WL 22161591, at

*10 (N.D.N.Y. Sept. 12, 2003) (citing, *inter alia*, *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d

Cir. 1983)).  In order for the VE's opinion to be considered substantial evidence, the ALJ "must

elicit the VE's testimony by asking hypothetical questions addressing the claimant's particular

limitations and capabilities." *Valoshin v. Sec'y of Health and Human Servs.*, 1986 WL 14624, at *5

(E.D.N.Y. Oct. 31, 1986) (citing *Aubeuf v. Schweiker,* 649 F.2d 107, 114 (2d Cir. 1981)).  A VE's

testimony should be given credit and due weight when "there is substantial record evidence to

support the assumption [underlying the hypothetical] upon which the vocational expert based his

opinion." *Renna v. Barnhart*, 2003 WL 21005281, at *3 (E.D.N.Y. May 2, 2003) (citing *Dumas v.

Schweiker,* 712 F.2d at 1554); *see also Aubeuf v. Schweiker*, 649 F.2d at 114 ("The vocational

expert's testimony is only useful if it addresses whether the particular claimant, with his limitations

and capabilities, can realistically perform a particular job.").

Due to Plaintiff's physical limitations, some of which resulted in significant erosion of the

occupational base, the ALJ elicited the opinion of David Festa, a vocational expert.  Mr. Festa

opined that Fox's prior work vocational background was a combination of "sales clerk, retail trade"

with a specific vocational profile of "semi-skilled level 3," with a strength level between "light, up

to 20 pounds occasionally, 10 pounds frequently" and "stock clerk" with an exertional range to

"heavy."  Tr. at 51-52.  The ALJ then posed the following hypotheticals, which the VE responded

to accordingly:

> **Hypothetical One (Tr. at 56):**  An individual of Claimant's age, education, and work
> experience, with no limitations in walking, bending, sitting or standing, not able to lift
> or carry anything with the dominant right hand and up to four to five pounds with the

left hand.[12]
**VE Response (Tr. at 56):**  Such an individual could not perform Claimant's prior work nor could he perform, given the lifting limitations, any other jobs in the national and regional economy.

**Hypothetical Two (Tr. at 57):**  An individual with Claimant's age, education, and work experience, who could lift up to twenty pounds occasionally, stand or walk up to six hours, unlimited pushing and pulling, with no postural or environmental limitations.[13]
**VE Response (Tr. at 57-58):**  Such an individual could not perform Claimant's prior work activity, but could perform work available in the national and regional economy, such as a furniture rental consultant.  Such work is considered light work with occasional reaching and handling.  There are 365,866 jobs in the national economy and 800 jobs in the central New York area.

**Hypothetical Three (Tr. at 58):**  An individual with Claimant's age, education, and work experience, with no limitations in sitting, standing, walking, or bending, no environmental, speech, or visual limitations, with the only limitation being that the individual could not use the dominant right arm for any lifting, pushing, pulling, repetitive movement or fine motor movement.[14]
**VE Response (Tr. at 58-59):**  Such an individual could not perform Claimant's prior work activity but could perform the job of a surveillance system monitor, which is considered a sedentary job with lifting up to ten pounds occasionally.  The only physical demands are talking and hearing frequently, while everything else would be considered negligible.  The environmental conditions would be considered quiet in intensity.  There are 132,980 jobs in the national economy and 200 in the central New York area.

**Hypothetical Four (Tr. at 59-61):**  An individual with Claimant's age, education, and work experience, with no lifting, pushing, pulling, or repetitive movements or fine motor movements with the dominant right arm and no reaching, handling, and feeling with the right hand, with no limitations in sitting, standing, walking, or bending, no environmental limitations, and the ability for occasional grasping and fine manipulation,

---

[12] This first hypothetical, describing an individual who cannot perform the full range of sedentary work, appears to be based on Plaintiff's allegations that he can't lift anything with his right hand and could barely lift four to five pounds with his left hand.

[13] This hypothetical, describing an individual capable of performing the full range of light work, appears to be based upon the Agency's Review (non-examining) Physician, Dr. Gajwani, Residual Functional Capacity Assessment. Tr. 196-202.  Plaintiff asserts this hypothetical is without merit and notes that the ALJ did not apparently use this hypothetical in making his determination as there is no mention of it in his decision.

[14] The ALJ based this hypothetical on Dr. Gaffney's Medical Report, dated October 25, 2000.  Plaintiff asserts the hypothetical does not indicate any problem with the left hand or wrist.  In his Report, Dr. Gaffney does not mention any specific limitations with Fox's left hand beyond stating that he has mild left carpal tunnel syndrome.  Tr. at 203.

lifting no more than ten pounds, and occasional pushing, pulling, reaching, handling, and feeling with the left hand.[15]

**VE Response (Tr. at 61):**  Same response as given to Hypothetical Three, such an individual could not perform Claimant's prior work activity but could perform the work of a surveillance system monitor.

Based upon the VE's testimony, and using the Medical-Vocational Guidelines as a framework, the ALJ considered Fox's age, educational background, work experience, and RFC and determined that Plaintiff could make a successful adjustment to work that exists in significant numbers in the national economy and therefore was not disabled.

Plaintiff first contests the finding that he can perform sedentary work and that the Commissioner should have, based on the Regulations, found him disabled.  Plaintiff next asserts that the Commissioner failed to meet her burden at Step Five since the numbers of available jobs identified by the VE, and relied upon by the ALJ, do no represent the limited job (one in a broad category) that Plaintiff can perform.  Plaintiff claims that the number of available jobs identified by the VE were under the broad occupational group of "Protective Service Workers," however, consistent with the VE's testimony, given Plaintiff's functional limitations, Plaintiff can only perform one specific job in that category – surveillance system monitor – and the VE could not identify the number of jobs available for such profile.  Plaintiff also claims that the number of available jobs is further dwindled by Plaintiff's inability to complete some of the tasks of a surveillance system monitor, such as completing paperwork.  From this, Plaintiff concludes that the Commissioner has not identified jobs that exist in significant numbers, and thus has not met her burden at Step Five.

The VE testified that the job of a surveillance system monitor was sedentary and unskilled

---

[15] This hypothetical was based upon Dr. Gaffney's Medical Assessment of Ability to do Work-Related Activities, dated November 9, 2000.

and that Plaintiff could perform such job even if he was unable to use his dominant right hand and was limited with his left hand to occasional simple grasping and fine manipulation and lifting no more than ten pounds.  Tr. at 58 & 61.  Such testimony is consistent with the requirements for a surveillance system monitor as listed in the <u>Dictionary of Occupational Titles</u> (4th ed. 1991) ("DOT") § 379.367-010:

> Monitors premises of public transportation terminals to detect crimes or disturbances, using closed circuit television monitors, and notifies authorities by telephone of need for corrective action:  Observes television screens that transmit in sequence views of transportation facility sites.  Pushes hold button to maintain surveillance of location where incident is developing, and telephones police or other designated agency to notify authorities of location of disruptive activity.  Adjusts monitor controls when required to improve reception, and notifies repair service of equipment malfunctions.

We first address Plaintiff's claim that his limited ability to handle and work with small objects with both hands results in a significant erosion of the unskilled sedentary occupational base.  Plaintiff asserts that because most unskilled sedentary jobs require bilateral manual dexterity, the loss of the use of his dominant hand combined with the loss of bilateral manual dexterity "is significant and, thus warrants a conclusion of 'Disabled.'"  Dkt. No. 13 at p. 16 (quoting S.S.R. 83-14, 1983 WL 31254, at *4, *Program Policy Statement Titles II and XVI: Capability to do Other Work – The Medical-Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments* (S.S.A. 1983)).  In support of his contention, Plaintiff points to a former regulatory provision that was in effect at the time the ALJ rendered his decision.  The regulatory provision included an example of a claimant who was limited, due to a permanent injury to the right hand, to unskilled sedentary work that did not require bilateral manual dexterity, and stated that since the "inability to perform jobs requiring bilateral manual dexterity significantly compromises the only range of work for which the individual is otherwise qualified (i.e., sedentary)

a finding of disability would be appropriate."[16]  20 C.F.R. Part 404, Subpart P, App. 2, § 201.00(h)

(Example 1) (2000) (cited in S.S.R. 96-6p, 1996 WL 374185, at *8, *Policy Interpretation Ruling*

*Titles II and XVI: Determining Capability to do Other Work – Implications of a Residual*

*Functional Capacity for Less Than a Full Range of Sedentary Work* (S.S.A. 1996)).  The

Commissioner points out that the regulatory provision and example cited by Plaintiff was

eliminated from the Regulations on August 28, 2001, due to the fact that such examples tended to

be misinterpreted and misapplied as rigid directives.[17]  Dkt. No. 14 at pp. 12-13 (citing Federal Old-

Age, Survivors and Disability Insurance; Determining Disability and Blindness; Revision to

Medical-Vocational Guidelines, 66 Fed. Reg. 45,162 & 45,165-66 (Aug. 28, 2001) (effective Sept.

27, 2001)).  While we find the subsequent amendment to be persuasive given that the amendments

merely clarify the rules that were in existence at the time ALJ Medicis rendered his decision, we

need not rely completely on such revisions as it was clear at the time of the ALJ's decision that

Fox's inability to perform the full range of sedentary work did not **mandate** a decision of disability,

but rather, directed that the Medical-Vocational Guidelines be used as a **framework** and the ALJ

should, and did, consult other vocational resources, such as a vocational expert to ascertain the full

extent of the erosion of the unskilled sedentary occupational base.  The Medical-Vocational

---

[16] In its entirety, Example 1 stated prior to the amendment:
An individual under age 45 with a high school education can no longer do past work and is restricted to unskilled sedentary jobs because of a severe medically determinable cardiovascular impairment (which does not meet or equal the listings in Appendix 1).  A permanent injury of the right hand limits the individual to sedentary jobs which do not require bilateral manual dexterity.  None of the rules in Appendix 2 are applicable to this particular set of facts, because this individual cannot perform the full range of work defined as sedentary.  Since the inability to perform jobs requiring bilateral manual dexterity significantly compromises the only range of work for which the individual is otherwise qualified (i.e., sedentary), a finding of disabled would be appropriate.
20 C.F.R. Part 404, Subpart P, App. 2, § 201.00(h) (Example 1) (2000).

[17] The current Regulation provides that "the inability to perform the full range of sedentary work does not necessarily equate with a finding of disabled."  20 C.F.R. Part 404, Subpart P, App. 2, § 201.00(h)(3) (2005).

Guidelines direct conclusions as to disability where a particular claimant's abilities matches all the criteria of a particular rule.  Where, however, "any one of the findings of fact does not coincide with the corresponding criterion of a rule[,]" such as in this case where the claimant cannot perform the full range of sedentary work due to a non-exertional impairment, "the rule does not direct a decision[ and instead,] the medical-vocational rules must be used as a framework for considering the extent of any erosion of the sedentary occupational base[.]"  S.S.R. 96-6p, 1996 WL 374185, at *3-4.  Social Security Ruling 96-6p further states that

> the mere inability to perform substantially all sedentary unskilled occupations does not equate with a finding of disability.  There may be a number of occupations from the approximately 200 occupations administratively noticed, and jobs that exist in significant numbers, that an individual may still be able to perform even with a sedentary occupational base that has been eroded.

*Id.* at *4.

Thus, Plaintiff is incorrect in his position that the Regulations in effect at the time the ALJ rendered a decision decreed a finding of "disabled."[18]  In this vein, ALJ Medicis was entirely correct to call on the services of a vocational expert to ascertain the extent of the erosion of the occupational base and to accordingly use the Medical-Vocational Guidelines as a framework.

We next address Plaintiff's contention that the VE failed to identify that a significant number of surveillance monitor jobs existed in the national or regional economy.  In addition to his argument that his inability to perform bilateral manual dexterity significantly erodes the sedentary

---

[18] Other courts in sister circuits have similarly held that neither S.S.A. 96-6p nor 20 C.F.R. Part 404, Subpart P, App. 2, § 201.00(h) direct the conclusion of disabled.  *See Lauer v. Apfel*, 169 F.3d 489, 493 (7th Cir. 1999); *Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990) (example provided in Regulations merely addresses the applicability and appropriateness of a grid rule); *Reece v. Apfel*, 92 F. Supp. 2d 1174, 1182 (D. Kan. 2000) (noting that the Regulations suggest that if an occupational base is significantly eroded, the ALJ may properly consult a vocational expert); *Pagan v. Callahan*, 1998 WL 633702, at *6 (E.D. Pa. Aug. 17, 1998) (noting that the example is included to "illustrate circumstances in which 'a finding of disabled is not precluded,'" as opposed to designating when a finding of disability is "absolutely required"); *Osborne v. Chater*, 1996 WL 1063665, at *5 (N.D. Ga. Aug. 12, 1996) (noting that the language of § 201.00(h) is permissive rather than mandatory and the rule does not dictate a finding of disability).

occupational base, Fox claims that the Commissioner failed to meet her burden at Step Five because she failed to identify a significant number of jobs that exist in the national or regional economy. According to Plaintiff, the VE identified 132,980 jobs nationally and 200 in the Central New York area for the occupational group of Protective Services; however, in response to Hypothetical Three and Four, the VE noted that given Fox's exertional and non-exertional limitations Plaintiff could only perform one job within that occupational group, namely, a surveillance system monitor.  Thus, Plaintiff asserts that the number of jobs identified by the VE is unreliable as the actual number of jobs that exist is much lower.  Furthermore, in somewhat reiterative fashion, Plaintiff asserts that in identifying the job of a surveillance system monitor, the VE failed to take into account Fox's specific limitations regarding manual dexterity, thus, the number of jobs identified is even further dwindled.  During the second Hearing, the following colloquy took place when Fox's advocate cross-examined the VE:

> **Q:** Would it also be reasonable to – that an individual performing [the system surveillance monitor job] would be doing – filling out some kind of reports or paperwork?
>
> **A:** Correct.
>
> **Q:** And would it maybe affect your opinion somewhat if – would you consider the fact that the Claimant i[s] not to be using his right dominant hand for fine manipulation, which would include writing.  Do you think that that [sic], perhaps, would make you reconsider, somewhat, his ability to perform that job?
>
> **A:** I would – see, that would really depend on job specific employers, because they do do [sic] adaptive things for people who can't hold pens or pencils.  They can use headsets and dictate their reports.  And there's other ways of doing that and put them on tape.
>
> **Q:** Well – but, generally filling – if one's doing reports, they would be doing writing?
>
> **A:** If a person could not – if he was right hand dominant and could not write with his right hand, he would have difficulty performing the job.
>
> **Q:** So, considering that fact and the fact that probably most of these would be – reports would be written, that could affect whether or not the Claimant could perform this job?
>
> **A:** Although I did mention there was very negligible amount of grasping and fine

> manipulation that had to be done with this job.
>
> **Q:**    But there is some writing involved?
>
> **A:**    There is some, negligible.

Tr. at 68-69.

Based upon the above, Plaintiff claims that the number of jobs identified by the VE is not an accurate or even fair representation of the number of available jobs.  We must disagree with Plaintiff's contentions and find that under the Regulations, he is not disabled.

We acknowledge, as indicated above, that Social Security Ruling 96-9p states that "[m]ost unskilled sedentary jobs require good use of both hands and the fingers, i.e., bilateral manual dexterity. . . . Any significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base."  S.S.R. 96-9, 1996 WL 374185, at *8; *see also* S.S.R. 83-12, 1983 WL 31253, at *4, *Program Policy Statement Titles II and XVI: Capability to do Other Work – The Medical-Vocational Rules as a Framework for Evaluating Exertional Limitations Within a Range of Work Between Ranges of Work* (S.S.A. 1983) (noting that the "[l]oss of major use of an upper extremity is rather definitive in that there is a considerable absence of functional ability").  However, such condition does not automatically dictate a finding of disability.  Instead, to meet the Step Five burden, the ALJ properly consulted a VE to determine the extent of the erosion.  20 C.F.R. § 416.966(e); *see also Colon v. Comm'r of Soc. Sec.*, 2004 WL 1144059, at *9 (N.D.N.Y. Mar. 22, 2004) (citing S.S.R. 96-9p for the proposition that a determination that an individual's limitation results in a significant erosion of the occupational base does not end the inquiry as additional vocational resources, such as a VE, should be consulted to determine the extent of such erosion).

While there is caselaw that states that a claimant who is restricted in making bilateral repetitive hand movements cannot perform the job of a surveillance system monitor, *see Cross v.*

*Comm'r of Soc. Servs.*, 2003 WL 22174570, at *6 (D. Kan. Aug. 27, 2003) (claimant who has

manipulative limitations "beyond the ability to make rapid repetitive hand movements cannot

perform either telephone solicitor or security system monitor position); *Kuleszo v. Barnhart*, 232 F.

Supp. 2d 44, 55 (W.D.N.Y. 2002) (surveillance system monitor position cannot be performed by a

claimant with fine manipulation or fingering impairments); *Troy ex rel. Daniels v. Apfel*, 225 F.

Supp. 2d 1234, 1240-41 (D. Colo. 2002) (security monitor position requires fingering and handling

and cannot be performed by a claimant who can only occasionally finger and cannot frequently

handle), we find such cases, which are not in any way binding upon this Court, to be inapposite to

the DOT description of such job, which notes that aptitudes for handling, fingering, and feeling are

not present, *see* <u>Dictionary of Occupational Titles</u> § 379.367-010.  In our case, the VE's testimony

about the requirements of a system monitor was entirely in accord with the DOT description.  Thus,

the ALJ was entitled to rely on such testimony as to how the job is normally performed.  *See* S.S.R.

00-4p, 2000 WL 1898704, at *2, *Policy Interpretation Ruling: Titles II and XVI: Use of Vocational*

*Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in*

*Disability Decisions* (S.S.A. 2000) ("In making disability determinations, we rely primarily on the

DOT . . . for information abut the requirements of work in the national economy.").  Since the DOT

lists "maximum requirements of occupations as generally performed, not the range of requirements

of a particular job as it is performed in specific settings[,]" the ALJ properly relied on the VE's

testimony regarding specific information about job requirements, such as an employer's willingness

to accommodate an employee's inability to write with his dominant hand.

   We further note, in accordance with the Regulations, that the availability of only one

sedentary occupation, *i.e.*, surveillance system monitor, "although an indicium that [a claimant's]

*-31-*

full range was significantly eroded, did not mandate a finding that [such claimant] was disabled."

*Colon v. Comm'r of Soc. Sec.*, 2004 WL 1144059, at *9 (noting that such a finding would be in

"contravention" of 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A), 1382c(a)(3)(A), and 1382c(a)(3)(B),

which require that a claimant be unable to engage in any kind of gainful employment available

nationally or regionally); *but cf. Kuleszo v. Barnhart*, 232 F. Supp. 2d at 55 (holding that "[t]he

existence of only one unskilled sedentary job, *i.e.*, surveillance system monitor, indicates that the

full range of sedentary work is significantly eroded.").  The VE noted the wide-spread use of

surveillance system monitors for parking lots, grocery stores, warehouses, motels, and hotels.  Tr. at

68.  He further testified that he could not report the exact number of surveillance system monitor

jobs because no publication anywhere listed that figure, though surveys conducted by the

Department of Labor and the State showed 132,980 Protective Service Occupation jobs in the

national economy and 200 in the Central New York region.  *Id*. at 62-66 & 71.  Based upon his best

estimate, however, the VE testified that the number of surveillance system monitor jobs was a

"small percentage lower."  *Id*. at 64-65.

According to the Regulations, "[w]ork exists in the national economy when there is a

significant number of jobs (in one or more occupations) having requirements which you are able to

meet with your physical or mental ability and vocational qualifications."  *Id*. at § 416.966(b).  The

Regulations also provide that,

> work exists in the national economy when it exists in significant numbers either in the
> region where you live or in several other regions of the country.  It does not matter
> whether –
> > (1) Work exists in the immediate area in which you live;
> > (2) A specific job vacancy exists for you; or
> > (3) You would be hired if you applied for work.

*Id*. at § 416.966(a).

Courts have generally held that what constitutes a "significant" number is fairly minimal. *See Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (citing various cases such as *Trimiar v. Sullivan*, 966 F.2d 1326, 1330-32 (10th Cir. 1992) (850-1,000 potential jobs is a significant number of jobs), *Nix v. Sullivan*, 744 F. Supp. 855, 863 (N.D. Ind), *aff'd*, 936 F.2d 575 (7th Cir. 1991) (675 jobs is a significant number), *Barker v. Sec'y of Health and Human Servs.*, 882 F.2d 1474, 1479 (9th Cir. 1989) (1,266 jobs is a significant number), *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (500 jobs is a significant number), *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) (1,350 jobs is a significant number), and *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (174 jobs is a significant number)); *see also Johnson v. Chater*, 108 F.3d 178 (8th Cir. 1997) (200 jobs in entire State of Iowa and 10,000 nationally is a significant number); *Wright v. Chater*, 969 F. Supp. 143, 147-48 (W.D.N.Y. 1997) (1700 jobs in the Finger Lakes region is a significant number). Similarly, we find that the number of jobs identified by the VE, even if diminished by a small percentage in his estimation, constitutes a significant number of jobs, which the ALJ properly relied upon in finding that work existed in the national and regional economy that Plaintiff could perform and thus was not disabled.

### III.  CONCLUSION

In light of the foregoing discussion, it is clear that in finding Fox was not disabled, the ALJ applied the correct legal standards and his factual findings were supported by substantial evidence. Thus, this Court recommends that decision be upheld.

**WHEREFORE**, it is hereby

**RECOMMENDED**, that the Commissioner's decision denying disability benefits be **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

**<u>FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE</u>**

**<u>APPELLATE REVIEW.</u>**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

IT IS SO ORDERED

Dated:         June 1, 2006
               Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge